Department of Children and Families Mr. Stewart, I'm jealous too. You get to live in my old home, my old town. A lot of people are. Ms. Hashimoto, good morning. Thank you, Your Honor, and may it please the Court. When Ms. Hood filed her complaint in this case five years ago, she asked for a gender dysphoria policy that conformed to professional standards so that she could receive treatment for her gender dysphoria. That has been her consistent request, including in her response to the 2016 Show Cause order. But no court has ever ruled on the merits of her claim that defendants have failed to provide a gender dysphoria policy that conforms to the professional medical standard. My concern about it is that at the time she filed the complaint, there was no policy. That's correct. And the Department has since adopted one, right? Yes. And it does not appear to me that the complaint attacks that policy and that she needs a pleading that would do that, that would challenge the policy as unconstitutional, explain in what manner it is. But it seems to be the sort of thing that would require a new complaint because the facts have changed. I disagree with that, Your Honor, in a couple of different ways. First of all, in her complaint, she doesn't just ask for any gender dysphoria policy. On page four of her complaint, she asks for preliminary injunctive relief for the formulation of a policy for the treatment of transgender, transsexual and gender nonconforming people by the defendants in conjunction with the World Professional Association for Transgender Health Standards of Care, seventh version. I recognize that. But what is missing is any description whatsoever of how the policy that has since been adopted fails to conform to that. And I think in her response to the district court show cause order, she points out the ways in which it does not conform to those standards and does not meet the reasonable professional judgment standard. In particular, the policy completely bars any sort of real life experiences. So she cannot dress as a woman, she cannot use a woman's name, and she cannot identify as a woman. And that's completely different from the World Professional Association for Transgender Health Standards. In addition, it does not permit counseling until she reaches phase two of her treatment for her sexual disorder. And those two things are completely unconnected. Is there I'm sorry, but is there any reason why we shouldn't remand it with orders to allow the district court or to have the district court allow the opportunity for an amendment? I think that that would make sense. Certainly, the district court has a very long record with this case. It's been pending for five years. And so I think allowing her to put the allegations that are in her response to the show cause order into an amended complaint would make sense. And as we argued in the brief, she that essentially. If we really want to join the issue and get it framed by pleadings, that's what needs to be done, isn't it? To remand with instruction. I mean, whether it was is a new civil action or whether it's an opportunity to amend the current complaint. It seems to me that we don't have a dispute about the new policy that's framed by the pleadings. If the response to the motion to show cause is read as a motion to amend the complaint, then I think there are the factual allegations. Well, even then, it would be a motion for leave to a file and amended complaint. And as you know, that would need to be that motion would need to be accompanied by a proposed amended complaint, which we don't have. I mean, that's that's really doing a lot of construing. That's true, Your Honor. But she was pro se at the point that she was responding to this show cause order. And the other thing is that she was in this position because FCCC didn't pass this policy until three weeks before trial. After the case had dragged on for five years, three weeks before trial, they file a motion for summary judgment saying, oh, by the way, we passed a policy. And so her response to that, her response to the motion to show cause was hastily done because it had to be. I mean, there was a trial date set. And so to the extent that it is not as cleanly polished as it should have been, not only should this court take into account her pro se status, but that essentially falls on the defendants because they were the ones who waited until three weeks before trial to all of a sudden come up with this new policy. And I think that's what really makes this case so similar to Pesci, which involved the FCCC also and coming in, passing a new policy. And then the district court that had had the Pesci case for all of those years didn't rule on the constitutionality of the new policy. And so here, Ms. Hood had put forth in her response to the motion to show cause the same issues that the WPATH in their amicus brief point out as problems with the new policy that FCCC passed. And as I mentioned before, there is the policy says no real life experiences. And it doesn't allow for reasonable professional medical judgments. And so it's not even clear who adopted this policy. I mean, it's an FCCC policy, but it's not clear that any Youngberg professional judgment was ever exercised because the defendants never said who passed this policy. Who decided that this policy was medically appropriate? And Youngberg requires reasonable professional judgment, footnote 30, by people who are experts in the field. And there's nothing in this record to indicate that the policy that ended up getting passed by FCCC was the exercise of reasonable medical judgment exercised by experts in the field of gender dysphoria. I want to ask you, if we, I guess there are two things we could do in response to your request. And one is to construe the motion to show cause as a motion to amend. But if we remand it with instructions to allow amendment, I mean, is that any difference to you? I mean, do you care one way or the other if it gets back with the ability to amend? No, I think either way would work for us. But I think it has to go back to the district court. To your point, Judge Pryor, I think the one thing that's clear from what she asked for in her complaint is that her case was not moot at the point when it was dismissed. Her complaint about the absence of a policy certainly was. Yes, but her complaint. And that's what her complaint was. There wasn't a policy at the time. She complained about the absence of one. They now have one. And it seems to me that that's moot. Yes, the no policy at all. But she didn't just ask for a policy. She asked for a policy that complied with the Constitution and that would. Sure, but we don't have any pleading that attacks the new policy and explains how it fails to do that. I think the response to the show cause order does, Your Honor, because she points out the ways in which it does not comply with the constitutional standard. And all the way through her pleading, she talks about the Youngberg standard. And she talks about the fact that nobody is providing the reasonable professional judgment. And she says that in her complaint as well. The thing about it, though, is that it's really either way. So if the original complaint is moot, whether we construed this as a motion for relief to amend, I'm concerned about, you know, the burden we put on district courts and in having to make that kind of construction of pro se pleadings. I don't know. I'm not sure what the real danger is here. If she were to have to file a new complaint within a new civil action, it's going to be the same result, right? No. And here's why. First of all, this complaint had been, this case had been going on for five years. There was a history to this case. And the district court had obviously spent a lot of time with this case working on it. And so recreating all of that from scratch, this is now a district court that understands all of these issues. Judge Magnuson only dealt with the final. I mean, Judge Magnuson was the one who dismissed it as moot. But Judge Steele had this case for a very long time. It may very well be appropriate in the civil cover sheet to identify this case as a related case, if all of that is true. But it also would require. It's just not clear to me that her response to the order to show cause would fairly alert a district judge. Oh, this should be construed as a motion for leave to amend a complaint under any of our precedents. Your Honor, I think the fact that she was, first of all, she could have filed a motion for leave to amend because she hadn't amended her complaint before. But of more importance, I think this case just falls squarely within Pesce because it was procedurally very, very, very similar. It's a district court that had a long record with a particular case. FCCC comes in after the plaintiff has complained about the original policy as violating her First Amendment rights or his First Amendment rights. I apologize. And then FCCC passes a new policy. And the district court ruled on the constitutionality of the old policy. Can I ask you a question about that? Didn't she ask for more in her relief than simply a new policy? I mean, I thought she also asked for treatment for herself and a declaration that she would have been out had they allowed her treatment. Yes. And a bunch of other things. And are those things moot as a result of the enactment of the policy? No, none of those are moot. And so there's so she asked for treatment for herself. In 2015, the district court essentially said that she had alleged sufficient facts, that she had gender dysphoria, that she had been completely denied treatment and that there was deliberate indifference from that denial of treatment. The only reason the district court denied relief was because it mistakenly read her complaint to be asking only for hormonal treatment. And the district court said that Ms. Hood was not entitled to treatment of her choice. But she had asked for, as you point out, many other things in her complaint, including declaratory relief and the triad of treatment, real life experiences and all of the other forms that are set forth in the WPATH standards. Professor Hashimoto, before you sit down, I think Ms. Hood's First Amendment claim is an interesting claim at an interesting time. I'm not I don't count myself as a Supreme Court scholar, but if I'm right, no First Amendment claim lost in the most recent session of the term of the Supreme Court. I think that's accurate. Yes. And I was just wondering about the Packingham versus North Carolina case and whether you thought that had any impact on on Ms. Hood's case. It was the sex offender Internet case. And so there was a First Amendment claim. It's not this First Amendment claim, but. Yes. And I think in particular, the fact that this is somebody who has been civilly committed, so she is not she's not a prisoner. And the fact that this is such expressive, such expressive speech by her, allowing her to identify herself as who she is, I think is brings this case within Packingham. Thank you. It does seem to me, though, that if we thought the district court was right about in the district court did not or when it failed to construe them, her response to the motion to show cause as a motion to amend the district court at least heard and dismissing it with prejudice. Yes, that would be a jurisdictional problem. And that would not be a dismissal with prejudice. Is that right? That's exactly right. And so you had asked earlier whether she could just come in and file another complaint. Right. Only only if it's without prejudice. That's correct. Thank you, Mr. Wilson. Good morning. Good morning. May it please the court. The trial court's decision in this case was properly decided. And the reason why it was properly decided was because Hood's complaint sought constitutional liability, not against the medical professionals who actually made treatment and diagnostic decisions for Hood, but rather high level government officials who do neither. And in regard to... Can I ask you a question about your red brief? You say you talk about Ms. Hood's argument that the government didn't meet its burden of articulating and supporting a legitimate reason for not allowing the First Amendment expressions that she seeks. And you say it's unclear why defendants carry such a burden. Do you want to take that back? I mean, you have a burden to state a governmental interest. Do you not? That's certainly true. So I made that argument in the context of when the court made that decision was at the motion to dismiss phase. So the court was actually looking at the record and what was in the four corners of the record. And so for defendants at the time to proffer argument to move forth a burden that there was a legitimate governmental reason as to the First Amendment policy that was not in existence in the record at all, but the trial court properly assumed there was. So my argument was not to say that there's not a requirement on the government to have requirements. And they are charged with the care of Hood. So that's not to go in that direction at all. I mean, have you had an opportunity in the record to articulate Florida's governmental interest in not allowing Ms. Hood to go by Erica? And so the record is, it's fairly well developed with regard to, for the trial court to make those rulings as it did and using the Pesce case to walk through the reasons why there was a reasonable, rational, legitimate governmental reason. But where did you state that? Well, it was, I agree, Your Honor, it wasn't well developed in our motion to dismiss. But I believe that the record and the arguments brought forward at the time does allow the court to move forward. Where in the record is that? I can only tell you that it would probably be in the motion to dismiss, Your Honor, and it was just a short paragraph. I can't cite to the specific area right now on that. But I do believe that the record does contain everything before the court so as it would allow it to just to look at that issue and to be able to render an opinion as it properly did because it made inferences in favor of Hood to reach that argument. The court actually had to construe Hood's argument, First Amendment argument, that is, because it wasn't actually stated. And so the court went and inferred that all of his or all of Hood's expressions as far as name, clothing, hygiene, or feminine products, those were all inferred by the court as the stating expression under the First Amendment. The Florida Civil Commitment Center, how many people are housed there right now? It can house up to 6,800, Your Honor, and it runs average around 450 to 500. And Ms. Hood's been there, albeit not uninterrupted, since 2000, correct? That's correct. And I had a question. I mean, none of this is or maybe this is in the record. As I understand it, Florida's contract with the Civil Commitment Center requires housing for women. Is that right or do you know? I do not know that answer, Your Honor. I can elaborate in that Florida doesn't have, as we know, the Civil Commitment Center that we're talking about is an all-male facility. And so as regards to females that fall within the Sexually Violent Predator Program designation, there is an alternate or another place in which females would be housed and treatment would be provided. And that place exists? Yes, Your Honor. It's actually the South Florida Hospital in the Miami area. You don't know whether any women have been committed there through this program? There have been women committed through this program, Your Honor. Is that right? Okay. But is that in the record? No, it's not, Your Honor. Okay. So, I mean, if I understand your argument, it's that the claims, there were a set of claims that were alleged against two state defendants, two official defendants, but no allegation of how those individuals, higher-ranked officials, personally participated in any violation against Hood. And that insofar as the new policy is concerned, the complaint about the absence of a policy is moot because of the existence of that new policy. And a new complaint would have to be filed to challenge that new policy. Am I right? Yes, Your Honor. I certainly agree with that. But the district court was wrong, was it not, to dismiss the claim about the policy as with prejudice, right? I don't think the district court did err, Your Honor, because underneath this… Well, if it's moot, that's a jurisdictional problem. That's a dismissal without prejudice, isn't it? I agree with that, Your Honor, yes. It's not an adjudication on the merits. I agree with that, Your Honor, too, but leading into the triable issue that was designated as a bench trial, only on the issue of the formulation of the policy. Yeah, but that triable issue, if you're right that that triable issue, that remaining triable issue is moot, that the claim is moot, then you don't dismiss that with prejudice, right? I would agree with that, Your Honor. Okay, which is what the district court did. The court definitely did, but in light of that, too, the court was looking at, and as this court has held Mike and Lowe's Center, that there was no reason to allow an amendment because it would have been futile. Why would it have been futile? Why couldn't there be an amendment that wouldn't be futile? It really goes to the crux of HUD naming the government officials as the defendants because the government, if the claim is remanded, we're still left with two high-level government officials who arguably have, and using HUD's own words when he filed his pretrial narrative, HUD actually came out and said the only reason that the complaint was filed against former Secretary Wilkins and former Administrator Montali was because they occupied these positions at the time. HUD is not trying to bring a direct individual claim against those two gentlemen in their position, and the trial court correctly found that to be true. The complaint was certainly void of any individual actions, any factual allegations directed either to, so that's why the court went through its... Well, insofar, though, as the department now has a policy, and if HUD were to challenge that policy as violating HUD's constitutional rights, would HUD not be bringing official capacity claims against the high-ranking officials of the department who are responsible for that policy? And actually, you could end up with that at that juncture, Your Honor, but... I don't know why that's futile then. Well, it's futile in this case if the court allowed the case to be remanded based on the facts of the case and based on what you've pointed out is that this policy hasn't been implemented... The court allowed it to be remanded. I don't understand that, what you're saying. I'm sorry? You said the court allowed it to be remanded? No, if the court would allow it to be remanded. If this court remanded it. Yes, Your Honor. Okay. So you're still left with governmental officials trying to be held liable for, one, a policy that's not necessarily created for them. It's created by an independent corporate entity who runs the Florida Civil Commitment Center. The policy CL-27, it's clearly a court... If Ms. Hood wants to get this issue before a court, who should she sue? Well, you can develop facts to easily find that Hood could sue Department of Children's Families. I'm not going to deny that. The Department of Children's Families certainly has legal oversight of the operation of Florida Civil Commitment Center, but we recognize that that Civil Commitment Center is operated and run by an independent corporate entity. And that independent corporate entity has the expertise, the medical expertise, the psychiatrists to... And you might see that center as a relief defendant at least, but ultimately the decision to adopt the policy is not the center's decision, right? That's incorrect, Your Honor. The center decides whether to adopt the policy. That's correct, Your Honor. Because department-level officials at Department of Children's Families, they don't have the expertise with regard to running a facility, direct expertise with regard to running a facility for sexually violent predators. So does the Department of Children and Families then... What if the Department of Children and Families completely disagrees with the policy? Is there no recourse that it has? Must it just live with that policy? I'd imagine there'd be quite a large internal debate, but... Who has the ultimate say? Quite frankly, under Florida statute, the Civil Commitment Center would. Because there's specific authority... Which Florida statute is that? It's 934.930, Your Honor. And that wasn't raised below, but that statute provides specific authority for the adoption of rules. And that specific authority provided by the Florida legislation is directed at the Department of Children's with regard to the formation policies of a multidisciplinary team. And the multidisciplinary team actually goes to when you have the process of a person being released from prison. They have timelines to determine whether or not they're safe for society. And in this case, Hood was deemed to be a sexually violent predator. So that's the multidisciplinary team that's being referred to there. But the actual day-to-day operations of Florida's Civil Commitment Center is run by an independent operator. So I'm not saying that you can run into a set of factual issues that the Department would disagree. And I don't know ultimately what that outcome would be. But the point being with Hood is to remand the case, and I guess it goes to my version of futility, but is that you will have an open-ended case. And because the facts that Hood argues in the response to show cause, they're just subjective or they're speculative at this point. So just to be clear, the... the Civic Authority, I guess, and DCF. DCF loses. Is that clear? I would have to say that DCF would have to defer medical treatment-related decisions that are made by policies of Florida's Corp Corp to them. What about security decisions? So the security is run by the independent operator as well. Same for that. I'm sorry? Same for that. The State of Florida would have to defer to the Civil Commitment Center. I would have to agree with that because the Corp Corp, they do run the security-related issues. So, but I'm not saying that's an easy decision, but ultimately that's I think where you would have to end up. And would the Department then try to exercise procedural control over Florida's Civil Commitment Center with the independent operator? That probably is going to become an allocation in and of itself. But going back to Hood... This is interesting. Can I ask you another question about... I don't know if you... No, go ahead. About the district judge order. It looked like to me that the district judge required Ms. Hood to show deliberate indifference, and that's not the right standard, is it? Well, what the Court did in its motion to dismiss, at first it did overlay its deliberate indifference Eighth Amendment standard with the Youngberg 14th standard. So the Court talked about the application of Youngberg, and in so doing so it recognized, as this Court had put out in Lavender, the contours are controlled. So when the Court went through that analysis down through the Respondent Superior, recognizing that the individual, there lacked individual allegations... Let me just ask it in a more direct way. Because Ms. Hood is a civil detainee, not a prisoner, it's not a deliberate indifference standard, is it? I mean, we have to look at the professional judgment behind the policies because of her status, right? But in this case, there were no individual factual allegations to determine a professional judgment, and so the district... But just large, I mean... Yes. Okay. No, I wouldn't disagree with that. So the Court was left with the issue of the Eighth Amendment and the Fourteenth Amendment overlay, and it looked at the cases in Youngberg, Lavender, and Kyle, actually, to use those as a bounty to overlay its Eighth Amendment argument because it recognized the contours of the Eighth Amendment can provide and protect the rights of those that are civilly committed. And so the Court went through that respondent-superior analysis and ultimately found that Hood failed to raise factual allegations that there was an awareness, or subjected to awareness on the part of Montaldi and Wilkins, that there was a serious risk of harm to Hood. And the Court went further to look into the record to say, even if that's so, the lack of policy in and of itself doesn't necessarily show that there's a risk of substantial harm. So that's how the Court got to that and analyzed that part. But it overlaid that entire part, though, with the Fourteenth Amendment discussion so that it would go ahead and move and actually address Youngberg with the recognition that civil committees do have more considerate treatment. Mr. Wilson, thank you. Thank you, Your Honor. Professor Hashimoto. Thank you. DCF has custody of Ms. Hood. They have the responsibility for ensuring that she gets treatment for serious medical conditions. And so to the extent that FCCC, the Florida Civil Commitment Center, adopts a policy that does not comply with the Constitution and DCF approves that policy, DCF is the one that has the obligation, the constitutional obligation, to ensure that she gets the treatment. So DCF was the proper defendants here. And the district court, in its 2015 opinion, concluded that there was a serious medical need here or that she had alleged sufficient facts for that and that the defendants here, by providing absolutely no treatment at all to Ms. Hood, had violated her constitutional rights. As I mentioned, the one error was in saying that she had not asked for any relief except treatment of her choice. And in her complaint, she asked for many other forms of relief. Returning to the policy that now is in place, we would ask this court to remand for the district court to consider the constitutionality of that new policy and letting Ms. Hood amend her complaint to challenge the constitutionality of FCCC's hastily adopted policy that she had not had the chance to challenge except in her response to the order to show cause. Thank you. Thank you. Thank you. Our last appeal this morning is out.